## CRIST *vs.* THE STATE.

1. On the trial of an indictment for murder, the question before the jury was, the identity of the prisoner with the murderer. The State offered in evidence the registers of three several hotels, each from a different city, and each containing a different name, accompanied by parol proof that the three names were written by the prisoner, and that he was known by them respectively in the three cities; and they were admitted without objection from the prisoner. *It was held:*
    That, in considering the question whether the three names were written by the same person, the jury might compare the hand-writings in the several registers.
2. There is not any fixed form of words, in which the minute entries of courts are required to be made. They should show substantially that all was done at the trial which the law requires to be done, and this should be set down in fit and expressive words; but the form adopted in England, and followed in some of the United States, is not indispensably necessary to their legal sufficiency.
3. Although a trial may continue through several days of the term, and the adjournment and re-assembling of the court may be noted by the clerk on the minutes; yet, all that is recorded therein, from the beginning of the trial to the judgment, must be regarded as but one entry, and the whole may be looked to, to ascertain its sufficiency.
4. Where the minute entry in the record recited: "Thereupon came a jury, to-wit:" (here follow their names) "good and lawful jurors, who were selected and empanneled, well and truly to try the issue joined between the State of Alabama and the said defendant, and the trial of said cause commenced," and that the court adjourned in the evening until the following morning, the trial not being finished; and the next minute entry, after reciting that the court re-assembled on the following morning, continues: "Thereupon also came the defendant and his counsel, as also the counsel for the State, together with the jury that had been empanneled *and sworn as aforesaid,* and the trial of said cause was resumed; and after the evidence of all the witnesses had been given in, and the argument of counsel had been heard, the jury received the charge of the court, and *retired in charge of the sheriff to make up their* verdict, and now return into court, and *on their oaths* do say," &c. *It was held:*
    That it sufficiently appeared from the record that the jury was sworn; and that the Appellate Court would presume they were sworn before the testimony was heard.

10

5. When the jury in a criminal case is sworn "well and truly to try the issue joined between the State of Alabama and the said defendant," and the record shows that the defendant had been arraigned on an indictment for murder, and that he had pleaded "not guilty," the oath is a sufficient compliance with the requirements of the forty-sixth section of the tenth chapter of the Penal Code, (Clay's Digest 458.)

6. Whether the objection can avail in any case, that the past instead of the present tense is employed in recording the action of the court and jury, *quaere?*

ERROR to the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

The plaintiff in error, Nathan H. Crist, was indicted in the City Court of Mobile, for the murder of Theodore Nye. On the trial, a bill of exceptions was signed and sealed at the instance of the prisoner, and made part of the record by the court. It is in the following language:

"On the trial of this cause, it appeared in evidence, that on the 25th day of February, 1852, at about ten o'clock A. M., two persons arrived at the Eutaw House, in Mobile, and wrote their names on the register of the house, one as Theodore Nye, the other as N. P. Coleman; and they were known and passed by those names in Mobile; that they were put in a room together at their request.

On the morning of the 26th of February, 1852, Nye was found dead in his bed, with a contusion on his head, apparently made with a hammer, and with a towel bound tightly around his neck; a hammer was found under his bed. There was evidence tending to show, that Coleman had murdered him and had fled. The State offered in evidence the register kept at Tuft's Hotel, in New Orleans, containing the names of persons who applied for board at that hotel on the 21st February, 1852; and proved by one Baker, that the name of Nathan H. Crist, as found on said register of that day, was written by the prisoner as his name; that the prisoner came to the hotel on that day with Nye; that they roomed together; and that on the 24th February, they left that hotel together, to go, as they said, to Mobile.

The State then introduced in evidence the register of the Eutaw House, in Mobile, and proved by one A. H. Roulston, that the name of N. P. Coleman, entered on said register of the 25th of February, 1852, was written by the prisoner as

Crist v. The State.

his name; that he came to the hotel on the 25th February, 1852, with Nye, and that they roomed together, &c.

The State then introduced in evidence the register of the Exchange Hotel, of Montgomery, Ala., and proved by one Bolling, that the name of B. F. Tooker, entered on said register of the 29th February, 1852, was written by the prisoner as his name.

The State then introduced one Fleming, and proved by him that he sold the hammer, with which the homicide was committed, on the 25th February, 1852, and that he believed the prisoner to be the man to whom he sold it. The State also introduced several witnesses who testified, that the prisoner was in Mobile on the 25th February, 1852, during the night of that day, and on the morning of the 26th February, 1852.

The prisoner introduced W. L. Curl as a witness, who testified, that the prisoner left New Orleans on the 25th of February, 1852, in company with the witness; that the boat leaves New Orleans about mid-day, and arrives at Mobile on the next morning; and that they did not arrive in Mobile until the morning of the 26th of February, 1852, at an hour after the homicide was committed.

There was also other evidence for the State, and for the prisoner.

Among other charges, the prisoner asked the court to charge the jury, that they could not compare the several registers in evidence, with the view of ascertaining by that comparison that the name of N. P. Coleman, contained in the register of the Eutaw House, was in the hand-writing of the prisoner. This charge the court refused; and charged the jury, that inasmuch as the registers of Tuft's Hotel, the Eutaw House, and the Exchange Hotel, were in evidence before them, with the evidence of the witnesses as to the person who wrote the names Crist, Coleman, and Tooker, they might examine them in their retirement, in considering the question whether or not they were the hand-writing of one person. To the refusal to charge, and to the charge given, the prisoner excepted."

The minute entries in the record upon which assignments of error are founded, are as follows:

"This day came the State of Alabama by its solicitor, and also came the defendant in person and with his counsel; and thereupon he was arraigned upon an indictment charging him with the murder of Theodore Nye, to which, after hearing the same carefully read, he plead 'not guilty;' and the court thereupon, at the request of all parties, set the trial of said cause for Monday, June 28, 1852," &c.

"This day came the State of Alabama by its solicitor, and also came the defendant in person and by his counsel; and the plea of 'not guilty' having been made at a former day of the court, thereupon came a jury, to wit: [here follow twelve names,] good and lawful jurors, who were selected and empanneled, well and truly to try the issue joined between the State of Alabama and the said defendant; and the trial of said cause commenced, and proceeded until the hour of 9 o'clock in the evening, when, by the consent of parties, the court took an intermission until 10 o'clock to-morrow morning, the jury being left in the charge of the sheriff."

"Tuesday morning, June 29, 1852. The Hon. Alexander McKinstry, Judge, appearing in court at 10 o'clock, thereupon also came the defendant and his counsel, as also the counsel for the State, together with the jury that had been empanneled and sworn as aforesaid, and who had remained in the custody of the sheriff since 9 o'clock the night before, and the trial of said cause was resumed; and after the evidence of all the witnesses had been given in, and the argument of counsel had been heard, the jury received the charge of the court, and retired in charge of the sheriff to make up their verdict, and now return into court, and on their oaths do say, 'We, the jury, find the defendant guilty of murder in the first degree, and sentence him to the punishment of death.' It is therefore considered," &c. [Here follows the judgment for costs, &c.]

"And afterwards, to wit: &c., the following sentence was pronounced by the court in this cause, to wit:" [Here follows the sentence in the usual form.]

The errors assigned are:

1. The refusal of the court to give the charge asked by the prisoner;

2. The charge given by the court;

3. The record does not show that the jury trying the cause were sworn;

4. The record does not show that the jury were properly sworn;

5. The acts of the court below are not recorded in the present tense;

6. Other errors apparent upon the inspection of the record.

PERCY WALKER, for plaintiff in error:

1. The court erred in refusing the charge asked, and in the charge given. It is now well settled in England and several American courts, that it is not allowable to prove the handwriting of a party, by a comparison of the disputed paper with other writings admitted or proven to be genuine. 5 Adol. & El. 703; 2 C. & P. 477; 2 Stark. on Ev. 375; 3 New Hamp. 47; 1 Denio 343; 1 Iredell (Law) 16; 4 Wash. C. C. 729. This court has laid down the rule in two cases, that comparison could not be made by the jury. 2 Ala. 703; 5 ib. 747. The same ruling was made by Lord Eldon, in Eagleton v. Kingston, 8 Ves. 475. See also 1 Leigh 216; Anthon's R. (N. Y.) 97; 1 Dana 179; 9 Cowen 94. It is true, the precise point here raised was not presented to this court in either one of the two cases above referred to. In those cases, no evidence was adduced of the execution by the party of the writing in question. In this case, one witness testifies in behalf of the State, that the name of N. P. Coleman on the register of the Eutaw House, was written by the plaintiff in error. This is not sufficient to take the case out of the rule. The direct conflict between the testimony of Roulston and Curl brings the case fully under the operation of the rule.

If it is improper for a jury to compare hand-writings under particular circumstances, it is improper under all circumstances. The same reasons for denying them the right, when no evidence is before them that the disputed writing was made by the party, equally apply when there is a conflict of testimony on that point. In the one case, their conclusion is drawn solely from the comparison; in the other, comparison is resorted to for the purpose of settling doubts caused by the conflict of testimony. In each case, it is the comparison that shapes and determines their decision. In the case cited from

Anthon's (N. Y.) Reports, it is expressly ruled, that "comparison of hands is not admissible as subsidiary testimony, upon the clashing of oral proof." The distinction drawn by some courts, between comparison by witnesses and comparison by juries, is not warranted by correct reasoning. The general rule is, that it is error to admit as evidence of hand-writing the mere opinion and belief of a witness, without his first stating his means of acquiring a knowledge of such hand-writing. 17 Ohio R. 16. This court has adopted a different rule, in Henderson v. Br. Bk. Montgomery, 11 Ala. R. 855; but under this decision, a witness is not competent, unless he knows the hand-writing of a party. The recognized doctrine is undoubtedly that laid down by Gaston, C. J., in Pope v. Askew, 1 Ired. (Law) R. 16. Wherein is the inapplicability of this rule to a comparison by a jury? When witnesses are examined and testify under this rule, the verdict of the jury is controlled by the belief of the witness, "founded upon previous sufficient means of knowledge." When the jury themselves make the comparison, their verdict results from their belief, without their having any "previous sufficient means of observation," and without their having any "exemplar of the party's hand-writing" in their minds.

Again; to allow comparison by a jury, makes each juror a witness before the others, expressing his opinions, &c., not under oath. See 1 Leigh, 228, where the most conclusive reasons are stated, against allowing comparison by a jury.

Those courts which have permitted comparison of hands by a jury, rest their decision upon what they term "the impracticability of preventing it." But this is no legal reason. The court is bound to charge the law as it is; and the probable perverseness or stupidity of a jury constitutes no sufficient reason for not giving them proper instructions. "The best rule is, that comparison of writings by the jury shall not be allowed, in any case where it can be avoided. When we consider that the same course which is permitted in a case like this, may also be resorted to in a criminal case, for the purpose of conviction, we cannot draw the limit too carefully." *Per* Lord Denman, in Doe *ex dem*. Perry v. Newton and wife, 31 E. C. L. R. 383. The charge asked by the plaintiff

in error, and refused by the court, was in conformity with the.rule prescribed in 2 Ala. R. 703, and 5 ib. 747, and therefore should have been given. The bill of exceptions shows that the charge was warranted by the facts; that it was not abstract; and that the charge given by the court was calculated to impress upon the minds of the jury, that the principle of law requested to be given was denied by the court. This is error for which the judgment should be reversed, even under the rule laid down in the late case of Long v. Rodgers, 19 Ala. R. 321.

2. The record does not show that the jury was sworn; and this is a fatal error. It is true, that the minute entry of the proceedings of the second day of the trial, uses the terms, " empanneled and sworn as aforesaid;" but this does not cure the error. The words " sworn as aforesaid " have no efficacy; for there is nothing in the previous part of the entry to which they can refer—no antecedent. If, in an indictment, the place be laid " at B. aforesaid," when B. was not previously named, it is an incurable error. 1 Chitty's Crim. Law, 200. The same objection applies to the concluding portion of the entry, where it is recited that the jury " now return into court, and on their oaths do say," &c. The latter statement can mean nothing; for there is no warrant for it in the preceding portion of the entry.

But admitting the record shows the jury were sworn, it certainly shows that the proper oath was not administered to them. The form of oath invariably used in England, was substantially the form used in the State v. Jones, 5 Ala. 666; and this court ruled it to be the proper form. The oath prescribed in § 46, Ch. 10 of the Penal Code, is designed merely as a general oath to be administered to the jury for the term or week collectively. It does not apply to capital cases, for which special trials are provided, and special jurors are summoned, every step in whose organization is guarded with the utmost particularity, showing that the life of the accused is not to be sacrificed or endangered by the prejudice of juries or the inattention of courts. *In favorem vitæ*, the court will not intend that the proper oath was administered, but it must clearly and distinctly appear upon the record.

3. In the record of the judgment, the acts of the court are

not stated in the present tense. This is a fatal error. 1 Chitty's Crim. Law, 720–1; 1 Mod. 81; 3 Saunders 392; 1 Term Rep. 320.

M. A BALDWIN, Attorney General, and D. C. ANDERSON, Solicitor of the sixth Judicial Circuit, for the State:

1. When writings admitted to be genuine are already in evidence before a jury, they may compare a disputed writing with them, in determining the question of its genuineness. This rule is laid down, without qualification or exception, in Green. Ev. § 578, and cases there cited. In this case the hand-writing of Crist on the registers at New Orleans and Montgomery was proved, and those registers were admitted in evidence without objection on the part of the prisoner. It was then perfectly competent for the jury to compare the hand-writing of the names in them with that of the register of the Eutaw House, to determine whether the name of N. P. Coleman was also his writing. The conflict of testimony between Roulston and Curl, does not avoid the application of the rule, but makes the comparison more necessary and proper. State v. Givens, 5 Ala. R. 757. From the very nature of the case, it would be impracticable to prevent a comparison by the jury. 2 Ala. R. 703; 5 ib. 757. It is not contended on the part of the State, that the jury may compare writings which are introduced for the mere purpose of forming comparisons; but only that they may compare writings already in evidence, admitted or proved to be genuine, with the disputed writing, to determine whether it is genuine. In all the cases cited by plaintiff's counsel, the writings were introduced for the sake of comparison.

2. It is not necessary that the record should show that the jury were sworn. This was decided by this court in Minor's R. 62, and re-affirmed in Perdue v. Burnett, ib. 141; and no subsequent case has occurred, in which a contrary doctrine is held. All reasonable intendments will be made in favor of the regularity of the proceedings of courts of general jurisdiction. 1 Ala. R. 592; 2 ib. 287; 6 Porter 352; 9 ib. 310; 6 Ala. R. 486. But the record does show, with reasonable certainty, that the jury were sworn. The minute entry recites, that "they returned into court, and on their oaths do

say," &c., and the previous entry recites, that they were "empanneled and sworn as aforesaid," thus showing conclusively that the failure to insert the same fact in the first entry, was a mere clerical omission.

Even if the record contained no evidence that the jury were sworn, it is an irregularity which will be presumed to have been waived, in the absence of an exception in the court below, and the objection cannot be raised for the first time in the Appellate Court.

3. The form of the oath administered to jurors, is not material. 1 Chitty's Crim. Law 552.

LIGON, J.—I do not think there is any error in the record, so far as the bill of exceptions discloses the proceeding of the court below.

The facts set out show, that the several registers of the Eutaw House, Tuft's Hotel, and the Exchange Hotel were permitted to go to the jury without objection, accompanied by parol proof which tended to show that the names of "Nathan H. Crist," on the first, of "N. P. Coleman," on the second, and "B. F. Tooker," on the third, were severally written on them by the plaintiff in error, and that these were the names which he assumed in the several cities of New Orleans, Mobile and Montgomery. The jury being thus possessed of the writings, without the objection of the plaintiff in error, the law does not deny them the right to compare these signatures one with another, in order, by such comparison, to aid them in coming to a conclusion as to whether the name of N. P Coleman, found in that of the Eutaw House, was written by the plaintiff in error, and is the writing of the same person who wrote the two others.

Mr. Phillips, in his work on Evidence, lays down both the rule and the reason on which it is founded, in the following words : "Within a recent period a rule has been established, which amounts to a considerable relaxation of the strictness of the law in regard to the direct comparison of hand-writing. It is this : that a jury, upon a question respecting the identity of hand-writing, may take other papers already in evidence, and compare them with that which is in dispute, for the purpose of coming to a conclusion, from comparison, whether the disputed hand-writing is genuine." 1 Phil. Ev., 654–5.

"The principle on which this rule is founded, has been stated to be, that the jury having the documents before their eyes, and being obliged to look at them for another purpose, it is impossible to prevent their forming some opinion with respect to their being like or unlike the disputed writing; and, consequently, when their minds must be so employed, it is better for the court to enter into the examination, and to suggest such observations as may occur to it as to the value of such evidence. It may be remarked, that, from the constitution of the human mind, a jury might be expected to feel some gratification of curiosity in the discovery of minute coincidences in hand-writing, and that this feeling might often mislead them, even where the coincidences were fanciful or accidental.

"To prevent such consequences, a qualification is engrafted on the last mentioned rule, which is, that documents irrelevant to the issues on the record are not to be received in evidence at the trial, in order to enable a jury to institute such a comparison. The principle which has been above stated, as that on which a jury are allowed to compare hand-writings, does not extend to the admission of documents irrelevant to the cause. Such as are connected with the cause must be proved to be genuine, for the purpose of determining the matters in controversy."

Mr. Greenleaf, speaking of the relaxation of, and exceptions to the rule which requires that no evidence of hand-writing shall be allowed, except that of a witness who has a personal knowledge of the hand-writing of the party, states, as a second exception, "where other writings, admitted to be genuine, are already in the case. Here the comparison may be made by the jury. The reason assigned for this is, that as the jury are entitled to look at such writings for one purpose, it is better to permit them, under the advice and direction of the court, to examine them for all purposes, than to embarrass them with impracticable distinctions to the peril of the cause." 1 Greenl. Ev., 734, § 578.

These rules are generally received and acted upon in the English and most of the American courts, and clearly demonstrate the propriety of the charge given in the court below. Although in this case the hand-writing exhibited on the sev-

eral registers was not admitted by the plaintiff in error to be genuine, yet it appears to have been proved to be his by credible witnesses, and in two instances by testimony wholly unimpeached, and was permitted to go to the jury without any objection on the part of the plaintiff in error. This, I apprehend, will as effectually establish its genuineness, as though it had been admitted by the prisoner. After the jury had thus obtained possession of the writings, the court could not, according to well settled principles of the law, divest them of that possession, or deprive them, by its charge, of their privilege of comparing them with each other, to aid them in coming to a conclusion as to the genuineness of either.

The fact, that the testimony of the witness, Curl, conflicts with that of Roulston, who testified that the prisoner wrote the name of "N. P. Coleman" on the register of the Eutaw House on the 25th of February, 1852, when the balance of the record is examined, casts but little if any suspicion on the testimony of the latter. Curl swears, that the prisoner did not reach Mobile until the 26th of February, the day after the homicide for which he was indicted had been perpetrated, and that he came with Crist from New Orleans on that occasion in the same vessel. Opposed to this, however, is the testimony of Roulston, Fleming, and, in the language of the bill of exceptions, "several other witnesses," all of whom testified that the prisoner was in Mobile on the 25th of February, on the night of which day Nye was killed. None of these witnesses were impeached, and as Roulston is thus sustained, his testimony is sufficient to establish the hand-writing of the prisoner on the register of the Eutaw House.

But suppose a shade of suspicion had been cast upon the evidence of the genuineness of the hand-writing on this register, yet, as the testimony was sufficient to allow the writing on the register to go to the jury, and that, too, as far as we are advised, without any objection on the part of the prisoner, I can see no reason why the privilege of comparing this hand-writing with the others, in order to ascertain its genuineness, should be taken from the jury. That they could, under such circumstances, resort to such comparison for that purpose, has been already decided by this court in the case of the State v. Givens, 5 Ala., 747, in which it was said that, "where there

is other evidence, and the jury are in doubt, it is perhaps proper that they should, for the purpose of satisfying their minds, refer to writings which have been offered as proof in the cause. But whether or not it be correct to do so, in the nature of things it would seem impracticable to prevent it, as the jury are not bound to disclose the ground on which they attained a conclusion."

When it is apparent that that which is contended for as a rule to govern courts in the administration of justice, is in itself impracticable, and cannot be enforced by the court, such impracticability will be conclusive against its existence as a rule.

None of the cases to which we have been referred by the counsel for the plaintiff in error, conflict directly with these views. Most of them relate to attempts made on the trial to introduce instruments foreign to the issue, for the purpose of instituting a comparison to establish the genuineness of the disputed instrument. They all hold that this is not allowable. That, however, is not the question presented by the record before us, and consequently we express no opinion upon it.

The next error to which our attention is called, is supposed to be found in that portion of the minutes of the court which record its action at the time of, and during the trial, and it is said that this does not show that the jury was sworn. It may be here remarked, that we are not aware that there exists now, or ever has existed in the courts of this State, any fixed form of words in which such entries are required to be made. The form adopted in England, and followed in some of the United States, is not indispensable to the legal sufficiency of such entries. To make them good, they should show substantially that all was done at the trial which the law requires to be done, and this must be set down in fit and expressive words. No precise combination of them is necessary to the validity of the entry, although it is more comely and appropriate when made with a due regard to form, than when such form is wholly or to a great extent abandoned. Although the trial may continue during several days of the term, and the adjournment and re-assembling of the court may be noted by the clerk on his minutes, still, all that is recorded therein from the beginning of the trial to the judgment must be regarded as but one entry, and we may look to the whole to ascertain its sufficiency. 1 Douglass, 306.

However unclerical may be several of the terms found in this record, and however much it may be regretted that in, a record of so grave a character, any deviation from the appropriate language of ordinary forms may occur, yet, on the record, such as it is, there is no rational ground for doubt as to whether the jury were sworn before they entered upon the discharge of their highly responsible duties. The entry recites, "This day came the State of Alabama, by its solicitor, and also came the defendant in person and by counsel, and the plea of not guilty having been made at a former day of the court, thereupon came a jury, to-wit: (here follow twelve names,) good and lawful jurors, who were selected and empanneled well and truly to try the issue joined between the State of Alabama and the said defendant;——and after the evidence of all the witnesses had been given in, and the argument of counsel had been heard, the jury received the charge of the court, and retired in charge of the sheriff to make up their verdict, and now return into court and *on their oaths* do say, we, the jury, find the defendant guilty," &c.  It is also stated in said minute entry, at the part of it which is left blank in the extract above, that the court, by consent of parties, adjourned over from Monday evening until Tuesday morning, when it again met, the prisoner and his counsel and the solicitor for the State being present; and it proceeds, "together with the jury that had been empanneled and sworn as aforesaid." Here we have the terms "good and lawful jurors" returning their verdict "on their oaths," grouped together in the same entry. It would be difficult to arrive at any other reasonable conclusion, than that they were sworn. With a knowledge of the practice universally prevailing in this State, of swearing the jury in all cases before the testimony is introduced, it is not carrying the doctrine of intendment in favor of the regularity of the proceedings in courts of general jurisdiction too far, or to an unauthorized extent, to hold, that the jury in this case were sworn before they heard the testimony. "It is enough that the records of such a court are certain to a certain intent in general. It is not necessary that they should be certain to a certain intent in every particular, so as absolutely to exclude every possible conclusion, and all argument, presumption or inference against them. The time was in England, when, it

being entirely at the pleasure of the crown to grant or refuse a writ of error in a criminal case, subtle objections like that now raised were allowed to prevail, in order to carry into effect the presumed will of the crown to extend mercy to the prisoner. But it has long since been settled there, and certainly is the law here, that a judgment in a criminal case cannot be reversed without showing substantial error." The State v. Christmas, 4 Dev. & Bat., 410.

It is also said to be error, because by the record it appears that the nature and form of the oath administered to the jury was the same as that administered in the trial of ordinary issues before them, when it is insisted it should show that an oath conforming to that administered to jurors by the English courts in capital cases, or at least approximating to that oath, had been administered. Were this question entirely an open one in this State, we should regard the objection much too technical to deserve favor. But an objection substantially the same was made in the case of the State v. Pile & Pile, 6 Ala., 72, and was overruled by the court. In that case it had a claim to favor which it has not here, as it had been made in the court which tried the cause, and not for the first time in this court.

The record here shows that the jury was sworn "well and truly to try the issue joined between the State of Alabama and the defendant." We are at no loss as to what that issue was; for the same record distinctly informs us, that the defendant had been arraigned on an indictment at the instance of the State, charging him with the crime of murder, and that he had pleaded not guilty. His guilt or innocence of this charge was the only issue they could try. The oath recited in the record is a sufficient compliance with the requirements of § 46, 10th chap. of the Penal Code. The oath there prescribed by its terms is extended to both civil and criminal cases, and virtually abolishes or renders unnecessary the oath contended for by the counsel for the prisoner, and all others heretofore administered in such cases.

The objection that the wrong tense is employed in recording the action of the court and jury, that the past and not the present tense is used in reference to it, if of any value in any case, does not apply to this record.

It only remains to add, that there is no substantial error in the record, and the judgment is affirmed.