## THE STATE v. GIVENS.

1. Where writings are not so ancient that they cannot be proved by living witnesses, it is not allowable to prove the hand-writing of a party, by a mere comparison of the disputed paper with a writing admitted, or proved to be genuine. But when in the course of the trial, such evidence is admitted at the instance of the State, the error may be cured, by the court instructing the jury that the evidence was illegal, and should not be regarded by them.
2. A paper which is copied into an indictment for forgery, but touching which there is no allegation, and which can have no influence in determining, whether the defendant is guilty in respect to the forgery charged, is irrelevant to the issue, and cannot, upon proof that the defendant admitted its genuineness, be laid

The State v. Givens.

before the jury, that by a comparison with it of the note alleged to be forged, they may say, whether they were both written by the same hand.

3. Where no evidence is adduced to show that the defendant is guilty of the forgery of a note, as charged, it is not allowable for the jury to compare the note with a paper admitted to be written by the defendant, and if satisfied of the sameness of the hand-writing, to convict him of the offence.

4. A paper affirming that certain persons are solvent, and able to pay a note to which their names appear as makers, is a written expression of opinion, and not such a writing as may be the subject of a forgery, under act of 1836, defining the punishment of that offence.

5. If the intention to defraud is manifest, forgery may be committed by using a *fictitious* as well as a *real* name.

6. There can be no conviction upon a count charging an intent to defraud a person or corporation which has no existence; for non-entities have no rights to be prejudiced by such an act.

7. Where the charge is the false making of a note, &c., but the count also sets out a written recommendation of the solvency of its makers, without any allegation in respect thereto, the defendant may be found guilty by proof of the forgery of the note, although no evidence is adduced as to the recommendation.

8. Where the accused is guilty on some one or more, but not all the counts in the indictment, the jury should thus limit their verdict, according to the facts of the case; and the court should so instruct the jury when called on by the defendant.

The defendant was indicted in the circuit court of Benton, for forgery. The first count charges, that he "feloniously did falsely make, forge and counterfeit, and did cause and procure to be falsely made, forged and counterfeited, and did willingly aid and assist in the false making, forging and counterfeiting, a certain promissory note, which said false, forged and counterfeited promissory note is as follows, that is to say—" $1000. Benton county, 1st May, 1841. Ten months after date, we promise to pay to the cashier of the Branch of the Bank of the State of Alabama, at Montgomery, or order, one thousand dollars, for value received, negotiable and payable at said bank.

"JOHN NOWLES,

"THOMAS B. CAMBELL,

"Credit Thomas Durden. Agent.     "WILLIS G. CLARK."

"GENT.—The above note drawn by John Nowles, and others, is perfectly good. Mr. Nowles is good for twice the amount himself, all or either of the rest is good.

"STEPHEN KELLY,

"THO's A. WALKER."

" With intention to defraud one John Nowles, one Tho's B. Cambell, and one Willis G. Clark, contrary to the statute, &c."

The second count charges, that the defendant " feloniously did alter and publish as true, a certain other false, forged and counterfeited promissory note," of the tenor of that set out in the first count—" With intention to defraud the Branch of the Bank of the State of Alabama, at Montgomery, a public corporation, he the said Edward L. Givens, at the time he so altered and published the said last mentioned false, fictitious, forged and counterfeited promissory note as aforesaid, then and there well knowing the same to be false, fictitious, forged and counterfeited, contrary to law," &c.

In the third count, the defendant is charged with having in his possession a certain other promissory note of the same tenor as that set out in the first count ; that he " feloniously did falsely make, forge and counterfeit, and did cause and procure to be falsely made, forged and counterfeited, and did willingly aid and assist in the false making, forging and counterfeiting on, and to the last mentioned promissory note a recommendation of the makers of the said last mentioned promissory note ; which said false, forged and counterfeited recommendation is as follows:" (and is of the tenor of the writing which follows the promissory note in the first count.) " With intention to defraud the said Stephen Kelly and the said Thomas A. Walker, contrary to law," &c.

The fourth count charges the defendant with having in his possession and custody a certain other promissory note of the tenor of that set out in the first count, on and to which was written a false, forged and counterfeited recommendation of the tenor of that copied into the preceding counts. The defendant well knowing the premises, afterwards, to-wit, &c., " feloniously did utter and publish as true, the said false, forged and counterfeited recommendation of the said last mentioned promissory note, with intention to defraud the said Stephen Kelly and the said Thomas A. Walker : he the said Edward L. Givens, at the time he so altered and published the said false, forged and counterfeited recommendation of the makers of the said last mentioned promissory note, then and there well knowing the said recommendation of the makers of the said last mentioned promissory note to be false, forged and counterfeited, contrary to law," &c.

On the application of the defendant, the venue was changed to Cherokee, and by a jury of that county the defendant was tried on the plea of "not guilty," convicted, and received the sentence of the law.

On the trial three witnesses were examined for the State. 1. Stephen Kelly, who stated that he did not sign his name to the recommendation of the note set out in the indictment, and that it was not signed with his consent; the defendant in 1841, came by witnesses house, said some of his friends wanted accommodations from the bank, the members of the legislature from Benton were not at home, and his friends could not await their return ; the defendant asked witness to suffer him to use his name, and the witness authorized him by power of attorney to sign his name to recommendations " to such good bills of exchange or notes" as he thought proper. Witness knows no such men in Benton county as those whose names are subscribed to the note in question. The conversation between defendant and witness was in Benton county, and there the power of attorney was made. Witness was not very conversant with Thomas A. Walker's hand-writing, but would not suppose his name to the recommendation to have been written by him. The power of attorney was shown to the witness, and he identified it as the one to which he refered.

2. John D. Hoke understood defendant at one time to deny that he had a power of attorney from Kelly, to recommend paper. On comparing the recommendation and Kelly's name thereto with the signatures to the note, witness could not say whether they were written by the same person, but thought there was a resemblance between the name of Nowles as subscribed to the note and written in the recommendation. The letter G, subscribed to the note had a resemblance to the hand-writing to the recommendation : the name of Thomas A. Walker is in a different hand-writing, but it was witnesses opinion, that the name of Nowles in the note and recommendation were written by the same person. Witness knew no such men in Benton county as those whose names were signed to the note; could not say whether the power of attorney, note and recommendation were written by the same hand; his knowledge of the note was derived solely from what appeared on its face; that he had known defendant for several years, and had never heard of any imputation

against his character, until he was charged with the offence for which he was on trial.

3. Thomas A. Walker states that his name to the recommendation, is forged, and he knows no such men as those whose names are signed to the note in question. Witness had heard of the bank frauds in which his name had been used, and in making his third trip to Montgomery, to inquire into them, he met with the defendant, who in a conversation told him that he had a power of attorney from Stephen Kelly, one of the representatives from Benton to recommend bills and notes; that under this authority he had recommended Keith's note and two or three others. In answer to an inquiry, the defendant said, he had never recommended any note where witnesses name appeared to the recommendation. One of the directors of the bank came to Jacksonville, shortly after witnesses return from Montgomery, bringing with him the notes supposed to be forged. The note set out in the indictment was then shewn to the defendant, who was asked if he signed Kelly's name to the recommendation and wrote the same, and he answered affirmatively, but said he did not sign witnesses name, nor know who did. Upon being inquired of, defendant said he knew no men of the names of the makers of the note, residing in Benton county; he was then asked why he recommended the paper if he did not know the makers, to which he said he presumed the person who brought him the note, told him the makers were good, but he had forgotten who brought him the note, or to whom he delivered it, after he recommended it. Defendant said to witness, that he had denied having the power of attorney from Kelly, because Kelly was at the time a candidate for the legislature, and he did not wish to injure him in his election. Witness further stated, that from comparing the names of the makers of the note with the name of Nowles in the body of the recommendation, and the general formation of the letters, both in the names and words of recommendation, and also the word G, the initial of the middle name of Clark, and the word G, at the commencement of the recommendation, it is the opinion of the witness that the same person wrote the recommendation and the fictitious names to the note. This was all the evidence adduced at the trial.

The circuit court has referred, for our decision, the following questions of law, as novel and difficult. 1. Was the testimony

of the witnesses relating to the comparison of hand-writing founded upon such comparison, admissible evidence? 2. After having received such evidence in despite of the defendant's objection, and after the examination of witnesses, and arguments of counsel had closed, was it competent for the court to repair the error by instructing the jury that such evidence was illegal and should be disregarded by them? 3. Is it competent for the jury, by a comparison of hand-writing to conclude that a party charged with the crime of forgery is guilty of that offence? 4. If a person have a power of attorney authorising him to recommend " such good bills of exchange or notes" as he thought proper, to a bank for discount, is he guilty of forgery if he sign the name of his principal to the recommendation of a note signed with the names of fictitious persons, or of real persons not good for the amount, with the intention to defraud the bank or any other person? 5. Should the circuit judge in the present case have instructed the jury, that although they might believe all the evidence, yet they should not find the defendant guilty? 6. If the note was forged, and the ostensible makers were fictitious persons, under an allegation that the forgery was committed with intent to defraud them, could the defendant be found guilty on the first count? 7. Was the writing of the recommendation and subscribing Kelly's name thereto, with intention to defraud, under the laws of this State, a forgery? 8. Should the judge, on motion of the defendant, have instructed the jury, that if they found the defendant guilty, they should express by their verdict on which count they found against him? 9. To authorise the conviction of the defendant on the first count, is it necessary that it should appear that he forged the names of the nominal makers of the note, and *also the names subscribed to the recommendation?* 10. To convict the defendant under the third count, was it necessary for the State to prove that the defendant forged the name of Thomas A. Walker? 11. In order to sustain the third count, was it incumbent on the State to prove that the defendant forged the recommendation with intent to defraud Stephen Kelly and Thomas A. Walker? 12. Is the indictment defective, in charging no offence, in charging more offences than one, in joining a misdemeanor and a felony, or in joining an offence punishable by statute, with one which is indictable at common law? All these questions are raised, either upon an objec-

tion to the admission of evidence, to a prayer for instructions to the jury, to charges given, or to a motion in arrest of judgment.

The ATTORNEY GENERAL, for the State.   The note was dated in Benton county, andthis in the absence of all proof on the subject, is satisfactory evidence to show, that it was made there; and if the jury should find that it is a forgery, the legal intendment is, that it was there forged.

The indictment is good, though it alleges an intent to defraud persons who had no real existence.   If the defendant signed Kelly's name with an intention to defraud, he is guilty of forgery, and his power of attorney will not shield him from punishment. The confessions of the defendant were clearly admissible, and entirely satisfactory to show his guilt. If it was an error to allow the similarity of hand-writing to be shown by comparison, it was cured by informing the jury that such evidence should be disregarded.

E. W. PECK and S. F. RICE, for the defendant.   It was not allowable to prove the note and recommendation to have been made by the same hand, merely by the opinion of witnesses formed alone from a comparison.   [2. Russell on Crimes, p. 6 sec. 2 & note (2) Id. 363, note (u.)]   It has been sometimes said that the jury may compare disputed writings with papers admitted to be genuine.   [2 Russell on Crimes, 683, note (2); Greenl. Ev. 616; 2 Ala. Rep. N. S. 703.]   In South Carolina and N. Hampshire, it is held, that comparison by the jury may be made to aid doubtful proof, but is not evidence *per se.*   [2 McC. Rep. 518; 3 N. Hamp. Rep. 47.]   In Virginia, it has been decided that the jury cannot compare a genuine with a doubtful paper in any case. [1 Leigh's Rep. 216; 6 Rand. Rep. 316.]   But if the jury could have been allowed to compare the writings, the court erred in admitting the evidence founded on comparison, and that error was not repaired by informing the jury that such evidence was illegal.

The instrument alleged to be forged should be set out in words. and figures, that it may be seen whether it be what it is supposed. [2 Russell on Crim. 360.]   The recommendation of the note is not such a writing, as could, under our statute. be the subject of forgery.   [Aik. Dig. 109, 616; 1 Porter's Rep. 33; 2 Johns. Cases, 342; 2 Russell on Cr. 292, note.]   Nor will the making of a paper,

in the name of fictitious persons, constitute that offence. [East's P. C. ch. 19, sec. 46, page 957; st. Geo. 11, ch. 25.]

The note and recommendation are to be considered as distinct instruments, and there is no proof that the note was forged, but the confessions of the defendant, and these are inadmissible to establish such a conclusion. [15 Wend. Rep. 147; 16 Id. 53.]

There is no evidence, that the forgery was committed in Benton county, or at any place. Besides, to authorise a conviction of the defendant, the proof should have shewn that the note and recommendation were both forged; otherwise the *allegata* and *probata* will not correspond. The charge as to " uttering and publishing" is insufficient. [2 Peters' Dig. 345, § 14.] The jury should have been directed to apply the evidence to the different counts, and if defendant was not guilty upon all, should have expressed, by their verdict, the extent of his guilt. They also cited 3 Mason's Rep. 464; 3 T. Rep. 104, '6.

COLLIER, C. J.—It is laid down generally, as a rule, in the law of evidence, that it is not allowable to prove the hand-writing of a party by a mere comparison of the disputed paper, with a writing admitted or proved to be genuine. A witness required to testify upon the subject, must possess a previous knowledge, acquired by having seen the party write, or in some other legal manner. This rule has been relaxed where the writings are so ancient that they cannot be proved by living witnesses, and yet are not of such antiquity as to prove themselves. [See Greenl. on Ev. 611 to 616; 2 Starkie on Ev. 375, 6th Am. ed.; 1 Phil. Ev. 4 Am. ed. 490; 3 Phil. Ev. C. & H's notes, 1326 to 1331.]

In the case before us, the witnesses did not testify from any knowledge they had of the defendant's hand-writing, that the note alleged to have been forged, was written in whole, or in part, by him. But comparing the note with the recommendation, which with the exception of the name of Walker, was admitted to have been written by the defendant; they are of opinion, either that the signatures to the note were written by the same hand, or bear a similitude to it. This evidence, according to the rule stated, was the result of a mere comparison, without having an exemplar in the mind, derived from previous knowledge, to which, as a test, they could refer the note; and was consequently improperly admitted.

The State v. Givens.

But the error in the admission of this evidence, we think was cured by instructing the jury, that it was illegal and should be disregarded by them. We have repeatedly held, that a party in a civil cause may withdraw from the jury evidence he has adduced, and thus deprive his adversary of the benefit of an exception; and why the same indulgence should not be extended in a criminal cause, we are unable to discover. The withdrawal of improper testimony, is not to be regarded as the privilege of the party merely; it is not only a right but the duty of the court, upon becoming convinced, pending the trial, that it has sanctioned the admission of illegal evidence, so to inform the jury, and direct them to discard it. A defendant can never be prejudiced by such a course, as it is calculated to expedite justice, and if perchance, the improper evidence has exerted an undue influence on the minds of the jury, the court should accord to the defendant another trial.

Whether it is competent for the jury to assist their judgment by a comparison of writings, is a question about which the authorities do, by no means agree. One class maintains that the jury cannot determine whether a writing be genuine or false, merely by comparing it with another; a second, that they may compare writings for the purpose of settling a question of doubt where the evidence of the witnesses is contradictory; a third, that they may compare two papers, when properly in evidence, and from such comparison form an opinion of the hand-writing; and some of the American cases determine that any papers are admissible, whether relevant to the issue or not, for the purpose of comparison.

In Myers v. Toscan, [3 N. Hamp. Rep. 47,] the court say it cannot be left to the jury to determine whether a signature is genuine or not, by merely comparing it with other signatures proved to be genuine. But when witnesses, acquainted with the hand-writing have been called and examined, other signatures proved to be genuine, may be submitted to the jury to corrobate or weaken the testimony of such witnesses. So in Rowt's adm'x v. Kile's adm'r. [1 Leigh's Rep. 216,] it was determined, that proved specimens of a party's hand-writing could not be laid before the jury, that they might judge by a comparison thereof whether the disputed writing be genuine. [See also Boman v. Plunkett, 3 McC. Rep. 518.]

Mr. Greenleaf, in his work on evidence says, that a comparison may be made by the jury where *other writings* admitted to be genuine, are *already in* the case. The reason assigned for this is, that as the jury are entitled to look at such writings for one purpose, it is better to permit them under the advice and direction of the court to examine them for all purposes, than to embarrass them with impracticable distinctions, to the peril of the cause, [p. 613.] But the learned author says, that documents irrelevant to the issues on the record, cannot, according to the modern English decisions, be received in evidence to enable the jury to institute a comparison of hands. " For this," says he, two reasons have been assigned, namely : *first*, the danger of *fraud in the selection* of the writings offered as specimens for the occasion; and *secondly*, that if admitted, the genuineness of these specimens may be contested, and others successively introduced, to the infinite multiplication of *collateral issues* and the subversion of justice. To which may be added the danger of surprise upon the other party, who may not know what documents are to be produced, and therefore may not be prepared to meet the inferences drawn from them." [Id. 615.] The American cases on this point are by no means uniform, as we have already seen. In New York, Virginia and North Carolina, the English rule has been adopted; while in Massachusetts, Maine and Connecticut, it seems that any papers whether relevant to the issue or not, are admitted for the purpose of comparison of the handwriting. [Id. 616, note 1, and cases there cited; Russell on Cr. 3d Am. ed. 727, note 2.] In the Farmers' Bank of Lancaster v. Whitehill, [10 Serg. & R. Rep. 110,] it was decided, that other evidence being adduced to the point, writings admitted to be genuine will be allowed to go to the jury in a civil case, for the purpose of enabling them to determine by a comparison of hands, whether the paper in question, was written by the party who is sought to be charged with it. [See also McCorkle v. Binns, 5 Binn. Rep. 340.] And in the later case of Callan v. Gaylord, [3 Watt's Rep. 321,] the court say, that in this respect, there is no distinction between civil and criminal cases. See further, [3 Phil. Ev. 1326 to 1331, C. & H's notes,] where the law touching comparison of hand-writing, is largely considered with reference to the English and American decisions.

But there is also a decision of this court, which is pertinent to

the question. In Little, adm'r, &c. v. Beazley, [2 Ala. Rep. N. S. 703,] it was said that " comparision of hand-writing, by submitting different writings having no connection with the matter in issue, is not permitted by law." In the first and second counts of the indictment the defendant is charged with the forgery of a promissory note, which is set out literally; the recommendation is copied into the indictment, but there is no allegation in regard to it. Under these counts the recommendation would not be admissible, because it could have no influence in determining whether the defendant was guilty of the offence charged; and according to the case cited, being irrelevant to the issue on these counts, it could not upon proof, that the defendant admitted its genuineness, be laid before the jury, that by a comparison of the note with it, they might say whether they were both written by the same hand.

The question submitted under the third and fourth counts was, whether the defendant falsely made, &c., the recommendation of the note. To make out this issue, the recommendation, if in existence and within the reach of the prosecutor, was indispensable evidence. Under these counts it may be regarded as having been properly before the jury. The inquiry then arises, whether under such circumstances, the forgery of the note could be proved by comparing it with the recommendation. Whether a comparison by the jury is not permissible, where evidence, other than the genuine and disputed paper has been adduced, we need not consider; for in the present case, no direct proof of the forgery of the note was laid before the jury, but they were directed to determine that question by comparing the note with the recommendation. The law on this point, we have seen, is greatly embarrassed by contradictory decisions, and we will not undertake to lay down with exactness, what is believed to be the true rule on the subject; but we think that mere comparison of papers by a jury, is not allowable in the absence of all other proof, for the purpose of determining whether that, about which there is a controversy, is true or false. Where there is other evidence, and the jury are in doubt, it is perhaps proper, that they should, for the purpose of satisfying their minds, refer to writings which have been offered as proof in the cause. But whether or not it be correct to do so, in the nature of things it would seem impracticable

to prevent it, as the jury are not bound to disclose the grounds on which they attained a conclusion.

No evidence having been given independently of the writings, tending to show that the note was forged by the *defendant*, it follows that the instructions of the court to the jury, that this question might be determined by a mere comparison of hand-writing, was incorrect.

The sixth section of the act of 1836, enacts " that if any person, or persons, shall falsify, make, alter, forge or counterfeit, or cause or procure to be falsely made, altered, forged or counterfieted, or shall aid or assist in the false making, altering, forging or counterfeiting any letters patent, gift, grant, covenant, bond, writing obligatory, note of any bank of any of the United States, or of any bank established by law, in any one of the said States, or *branch of any territory of the United States*, or any bill or order, or acceptance of such bill or order, *cotton receipt,* receipt for the payment of money or other articles of value, promissory note, bill of exchange or accceptance thereof, will, indenture or deed, or any instrument of writing whatever, to secure the payment or delivery of money, or other article of value, or in discharge of any debt or demand, with intention to defraud any person or persons, or any corporation, or body politic, or shall either put off or offer, or cause to be offered in payment, exchange, pledge, or for sale, any such false, forged altered or counterfeited bond, writing obligatory, note of any one of the United States, or of any bank established by law in any one of the said States, or bank of any territory in the United States, or any bill or order, or acceptance of such bill or order, cotton receipt, or receipt for the payment of money, or any article of value, promissory note, bill of exchange, or acceptance thereof, will, indenture or deed, or any instrument of writing, or obligation whatever, to secure the payment or delivery of money, or any other article of value, in dicharge of any debt or demand, with intention to defrand any person or persons, corporation or body politic, knowing the same to be false, altered, forged or counterfeited, and shall be thereof convicted, &c."   The paper which the defendant is charged in the third and fourth counts with having falsely made, is nothing more than an affirmation that the makers of the note to which it refers were able to pay it.   It is a written expression of opinion, and cannot according to the rules of construction be

embraced by the statute cited. This point is too plain to require argument; it is clearly shown by a comparison of the recommendation with the terms employed by the legislature.

Forgery, at common law, has been defined to be " the fraudulent making or alteration of a writing to the prejudice of another man's rights" or "a false making, a making *malo animo,* of any written instrument, for the purpose of fraud and deceit." [2 Russ. on Cr. 3d Am. ed. 317.] There are also many *cheats* and *frauds* which are punishable at common law; whether the procuring of money upon the note by means of a false and fraudulent affirmation in respect to it, constitutes either of these offences, is a question not necessary to be now determined.

Lord Coke once said, " that forgery is properly taken *when the act is done in the name of another person."* But eleven of the English Judges were clearly of opinion in 1754, that the use of a fictitious name was within the letter and meaning of the statute of 2 Geo. II ch. 25, which, in describing the offence of forgery, speaks only of a false deed, &c., and does not say that it must be made in the name *of any person,* or *of another.* [2 East's Crown L. 957; see also 1 Leach, C. L. 97, 206; 2 Russell on Cr. 328, 9.] And in Rex v. Marshall, [1 Eng. Cr. cases, 74,] it was held, that where one *professing to* indorse a bill in his own name, indorsed a fictitious name, and thus negotiated it with an intention to defraud the indorsee, he was guilty of forgery. Our statute does not require that the false and fraudulent writing should be made in the name of a person having a real existence, and the construction placed upon the English act, applies with all force to a case arising here; and consequently if the intention to defraud is manifest, it is immaterial whether the names employed indicate real persons or not.

Our statute, it will have been observed, requires, that the forgery shall be committed *with intention to defraud some person, corporation or body politic.* A mere name is not a person, and it is a solecism to say that one can intend to cheat or injure a nonentity. This proposition seems to us to be axiomatic. The books which treat on *forgery* all concur that it is an indispensable constituent of the offence that it should have been committed to the prejudice of another's right. Such purpose or intent to defraud, must be stated in the indictment, and pointed at the particular person or persons, against whom it is meditated. [2 Rus-

sell on Cr. 353, 367.] If then, the ostensible makers of the note were mere imaginary persons, there could be no intent to defraud them, and it will follow that the first count does not charge the offence in a legal manner, and the defendant could not be convicted under it.

If the second count be good (and its sufficiency has not been questioned,) the defendant might be found guilty by proof of its allegations in respect to the note, without any evidence relating to the recommendation. There is no charge whatever, founded upon the recommendation, and though it is set out in the count it will not be treated as an essential part of it, but rather as something superfluous from which no legal consequences follow.

If the defendant was guilty upon either one or more of the counts, but the proof did not warrant his conviction upon the others, the jury could not with propriety find a verdict against him generally; but they should particularise by their finding, which of the counts were established by proof. The instruction prayed by the defendant's counsel on this point was, thus to direct the jury to perform their duty, and should have been given.

The record presents some one or more points on which our opinion is asked, but the questions answered, we think will lead to a correct determination of the cause, so far as the law is concerned. We have no desire to extend our opinion beyond what is strictly necessary, in this important, and in some of its facts, most extraordinary case.

The consequence of what we have said, is, that the judgment of the circuit court is reversed, and the cause remanded, that the defendant may be proceeded against according to law; and in the meantime, he is ordered to remain in legal custody, unless he shall be regularly discharged.